# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

REINALDO GLOVER,

     Plaintiff,

vs.

RICKY DIXON and C. CAMACHO, et al.,

     Defendants.

Case No. 3:24-cv-1107-BJD-SJH

## RESPONSE TO MOTION TO DISMISS
## PLAINTIFF'S SECOND AMENDED COMPLAINT

Plaintiff, REINALDO GLOVER, responds to the Defendants Rule

12(b)(6) Motion to Dismiss (Doc. 45) Plaintiff's Second Amended Complaint

(Doc. 40), and would show as follows:

In several respects, Defendants do not fairly represent plaintiffs second

amended complaint. For instance, Plaintiff does not allege that Sgt. Fisher *wrongly*

*believed* he was striking a light fixture. He alleges she "claimed" he was striking a

light fixture, an action he denies. (Doc. 40 at ¶¶ 11-13). Plaintiff is clearly alleging

that Fisher fabricated an excuse for spraying him. Not every reference to an event

constitutes an admission that it occurred or occurred as reported.

Plaintiff pleads that he did resist cuffing while asking Captain Banks to look

at the evidence of the spray pattern in his cell indicating he was not standing on a

bench. (Id. at ¶ 14). He had been attacked by an officer and locked in a holding

cell for what he was told was retaliation for an earlier incident. It would have

1

been easy at that point to show the pattern of the spray of chemical agents was inconsistent with Sgt. Fisher's story that he was standing on a bench. The duty to record and preserve that evidence was with Capt. Banks. After he was removed from the cell, the chance was lost to show Fisher's excuse was fabricated.

At this point, Plaintiff makes clear that he is having an emotional crisis. (Id. at ¶¶ 18-19). Plaintiff was experiencing fear because of the series of strange events. Earlier, he had been tackled by an officer out of the blue and had another officer make up an excuse for gassing him. As an S-3 (psych-3, the highest level before inpatient) inmate, he had a right to a Crisis Intervention but that was also denied.

When an inmate backs up to the cuff slot and puts his hands through, he is vulnerable to numerous pain techniques including twisting and bending back the fingers of his hands. An inmate is also vulnerable to pain techniques during a cell extraction but at least then, there is a camera recording the event. There is also a chance that among the five members of an extraction team there are at least some officers who will try to do their job the right way.

It is an unfair characterization of Plaintiff's pleading (and an impermissible inference) to say that he did "not appear to have a problem with the extraction." (Doc 45 at 3). (See Video Doc. 45-1B at 2:10-4:15).[1] Plaintiff notes that he cried out in pain during the cell extraction (Doc. 40 at ¶¶ 26-28) and that he was carried

---

[1] 2:10-4:15 indicates 2 minutes 10 seconds to 4 minutes 15 seconds on the video clip.

from the cell in a way that cause more pain to his cuffed wrists and shoulders as he was carried out by the elbows. This is a technique often used in four-man carries to maximize the pain by levering the arms out of the shoulder joints, a technique prisoners call "chicken-winging." (See Video Doc. 45-1B at 4:04).

One of the officers has a hand clasping the top of Glover's shoulder, using it as a fulcrum for levering up Glover's arm and increasing the pain. This is called a "shoulder lock" (See video 45-1B at 3:38) and it is designed for a recalcitrant prisoner on his feet. Plaintiff did not resist being carried; he only reacted involuntarily to the pain technique. (Doc. 40 at ¶¶ 31-32).

Once again Plaintiff declared a psychological emergency which was ignored and once again, no effort was made for crisis intervention.

Plaintiff complains of other pain techniques associated with the cell extraction. One was the gratuitous use of the spit shield (when he had not tried to spit on anyone). (Id. at ¶ 30). A spit shield is a hood place over the head that concentrates the fumes from gas that is soaked into the air and makes it hard to breathe. The second is the use of hot water for the shower since hot water opens the pores and intensifies the pain of the gas on the skin. Decontamination showers are always supposed to be cold water showers. In this case, Glover wasn't allowed into the shower room but hosed off with the hose used to clean the floors. (Id. at ¶¶ 33-35). (See video, Doc. 45-1B at 4:45-9:45).

Plaintiff also complains of officers squeezing his clavicle, twisting his

3

fingers, and leveraging his arms against his shoulder joints. (Id. at ¶¶ 36-38). These are things that can be done surreptitiously by experienced officers, especially when camera operator is not keeping a close watch.

From the use of CS gas, to the pressure points to the "chicken wing" carry techniques and repeated and sustained hyper-extension of the arms (See video, Doc. 45-1B at 4:45 to 9:45), to the hot water during the shower and hot air during the van ride,[2] opening the pores to the chemicals, to flushing water from the hair into the eyes, to the spit mask trapping concentrated chemical fumes, to the food deprivation, every mechanism was used to increase the pain. (Id. at ¶¶ 39-46). Only a small proportion of these is visible in the video clips.

Plaintiff has been very frank about his mental health issues. However, these were a traumatic series of events, from being tackled at the outset and placed in a holding cell to being sprayed multiple times with gas, including CS gas. CS is a heavy duty crowd control agent designed to be used outdoors because of its intensity. CS gas was used to clear tunnels in Vietnam and frequently resulted in fatalities. CS gas is routinely used by the Department of Corrections in Florida.

Defendants then make a contention that is both self-serving and inaccurate:

> Attached to the defendant's motion to dismiss are five (5) videos from the handheld cameras which show the entire incident of the cell extraction in the plaintiff's complaint. (See Defendant's composite exh. 1). The videos are central to the plaintiff's claim as it shows the entire incident and is the entire unaltered video showing from before defendant Camacho got to the

---

[2] On this hot July day, Capt. Camacho arranged for the heat in the van to be turned on, resulting in the fogging of the hand-held camera lens.

plaintiff's cell, the extraction at the cell, the condition of the plaintiff after the extraction and the return of the plaintiff to his cell.

(Doc. 45 at 4).  In fact, the video does not "show the entire incident." At a critical point in the events, the FDC camera turns off and clearly some time passes before video recording is resumed. If needed, Plaintiff could further plead that is a real red flag. Maintaining battery charges on video cameras is something that is supposed to be checked daily. In fact, there are supposed to be a seal on the camera receptacle that is dated and initialed by the correction supervisor who is tasked with checking it. Moreover, cameras have date and time stamps that are being intentionally turned off by correction staff. Supervisor lead-in statements are frequently speed-talked, slurred, and garbled, lacking dates and times. Continuity of events is virtually impossible to establish without visible time or date stamps.

The author of the Motion to Dismiss (Doc. 45) purports to certify (Doc. 45 at 5) that the videos are authentic and have not been redacted nor altered in any manner (Doc. 45, Video Exhibit 1). There is no indication where this statement is coming from or whether the "authentication" is authoritative.

In fact, not only are parts of the video missing but frequently all that is visible on camera are the officers or their backs with intermittent glimpses of the prisoner himself inside the mass of officers. What is happening out of sight is simply the *ipse dixit* of the movants. The distance and angle of the video shows little effort by the camera operator to display what is happening to the inmate.

5

Under the Rules, facts not documented by video, and all the reasonable inferences of those facts, are to be taken in the light most favorable to the non-movant.

## MEMORANDUM OF LAW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (q*uoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also id*. at 679 ("a complaint that states a plausible claim for relief survives a motion to dismiss"). To meet this "plausibility standard," the plaintiff must plead sufficient facts that permit the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678. While the Federal Rules of Civil Procedure do not require that allegations be set forth in detail — Rule 8(a) only requires a "short and plain statement" showing that plaintiff is entitled to relief — the claims must be "enough to raise a right to relief above the speculative level." *See Twombly*, 550 U.S. at 555; *accord, e.g., Iqbal*, 556 U.S. at 678 (noting that Fed.R.Civ.P. 8(a) does not require "'detailed factual allegations.") When reviewing a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations therein as true. *See, e.g., Brooks v. Blue Cross & Blue Shield of Fla. Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).

### A. Incorporation of Video by Reference Is Limited

At the summary judgment stage, all facts and inferences are taken in the

light most favorable to the non-moving party. At that stage, evidence, such as video recordings can be employed to rebut the non-movants pled allegations if they are inconsistent. At the pleading stage, extrinsic evidence is not normally admissible unless it is somehow incorporated by reference into the complaint. A writing, such as a contract, to the extent that it is referenced in the complaint can be considered "incorporated by reference." In this case, some video can be said to be "incorporated by reference" but not all. There are also questions raised by unexplained gaps in the video recording.

In *Thompson v. City of St. Cloud*, 2023 WL 3931952 (M.D. Fla. June 9, 2023), Plaintiff, Malcolm Thompson, sued city of St. Cloud and several police officers for false arrest, excessive force, and battery stemming from a 2019 incident. The defendants moved to dismiss the complaint and sought to submit surveillance video footage from two private businesses. They argued that these videos captured the underlying incident, corroborated their version of events, and effectively defeated the plaintiff's claims.

Thompson opposed the motion, arguing that the defendants failed to meet the legal requirements for incorporation because: 1. The complaint made no reference to the specific videos; 2. The videos were not "undisputed" because at least one lacked audio and contained obstructed views; and 3. The plaintiff had not been able to determine the authenticity of the videos.

The court denied the defendant's motion to submit the videos for

consideration. The court reaffirmed that extrinsic evidence can only be considered under the incorporation-by-reference doctrine if three requirements are met: 1. The plaintiff refers to the documents (or videos) in the complaint; 2. The documents are central to the plaintiff's claim; 3. The documents' contents are undisputed (meaning their authenticity is unchallenged)

The court found that the defendants in Thompson failed this test because the complaint contained no reference to the video footage and the plaintiff was unwilling to concede to the videos' authenticity. The court distinguished this from other cases where plaintiffs had specifically referenced bodycam footage in their complaints and agreed to let the court consider it. Here, the complaint makes reference to some video but does not accept the video with the unexplained gap.

In *Jackson v. Swanger*, No. 22-12946, Doc. 34 (11th Cir. April 5, 2024), a § 1983 lawsuit filed by Amber Jackson against Atlanta police officer Cody Swanger and Jeremiah Brandt, Jackson alleged she was unlawfully seized and subjected to excessive force after she moved a barricade to exit a mall parking lot following a peaceful protest. She claimed Officer Swanger pointed a gun at her, pulled her from the car, and "body slammed" her into the pavement, breaking her clavicle, while Officer Brandt failed to intervene. The officers hyperlinked four videos to their motion to dismiss: Swanger's body camera, Brandt's body camera (which was turned on late), a dash camera, and a "spliced" video combining bystander and bodycam footage. The district court exercised its discretion to consider only

8

the portion of Swanger's bodycam showing the seizure and immediate aftermath. It refused to consider the "spliced video" because it was not authenticated and the post-arrest footage because it was not central to the complaint.

The Eleventh Circuit held it lacked jurisdiction to review the district court's "discretionary ruling" to exclude certain video footage at the motion-to-dismiss stage. It clarified that evidentiary rulings are not legal abstract legal issues subject to interlocutory appeal. Reaffirming *Baker v. City of Madison*, the court noted that while "clear" video can override a complaint's allegations, the court "must construe all ambiguities in the video footage in favor of the plaintiff" at this stage.

In *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313 (11th Cir. 2010), Marcella Pourmoghani-Esfahani was detained at the Hillsborough County jail. After a disagreement, a physical struggle ensued with Deputy Shanna Marsh. The plaintiff alleged that while she was restrained face-down on the floor, the deputy grabbed her head and slammed it into the floor seven to eight times, causing cuts, cruises, and a pool of blood. The incident was captured on several closed-circuit cameras without sound. The deputy denied that the "face slammings" occurred and moved for summary judgment based on the video.

Video evidence is often not obviously contradictory because it may fail to convey spoken words or tone and may fail to provide an unobstructed view of the events. Where no "obviously contradictory" video is available --- such as when the view is blocked -- the court must credit the plaintiff's version of the facts for

9

the purposes of ruling on a motion for summary judgement or dismissal.

**B. Reliance on Video in Place of Pleadings**

In *Logan v. Smith et al.*, 439 11th Cir. 798 (2011): "In the context of cases involving video evidence, this Court will accept the video's depiction over the opposing party's account of the facts where the video obviously contradicts that version of the facts. But, even where the entire series of events is recorded, video evidence is not obviously contradictory if it fails to convey spoken words or tone, or fails to provide an unobstructed view of the events." Here, the video was missing critical moments and detail was obscured.

In *Pearson v. Taylor*, 665 11th Cir. 858 (2016): "To the extent that the video provides some reason to doubt the veracity of some aspects of Pearson's account, it is not so "blatantly contract[ory] that we may entirely disregard Pearson's version of events for purposes of summary judgment."  In *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313 (2010), the court found that "video is often not obviously contradictory because it fails to convey spoken words or tone and because it sometimes fails to provide an unobstructed view of events." Glover video is often started and ended without dates or times. Doc. 45-1C lasts only 1.5 minutes.

**C. First Amendment cause of action**

Defendants state that to survive a motion to dismiss in a retaliation case, "a plaintiff must make non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against

the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." See *Salahuddin v Mead*, 2002 WL 1968329 (SDNY) citing *Dawes v Walker*, 239 F.3d 489, 492 (2d Cir. 2001), See also *Bennett v Henrix*, 423 F.3d 1247 at 1253 (11th Cir. 2005). Doc 45 at 20.

In his complaint, Plaintiff has done exactly that. (1) He sets out the prior history of abuse and makes it clear that the speech chilled was in the form of grievances "against the most brutal guards including Capt. Camacho, (2) when he was threatened were physically abused and frequently suffered more abuse for his efforts." There are certainly allegations of adverse action and a causal connection is apparent. These allegations are all present in the complaint. ¶¶ 58-65. The relationship between staff at other institutions as well as the manner and mechanism of communication is likewise alleged. (Id.).

Counsel for defendants asked the court to take notice that:

[C]laims of retaliation are easily fabricated [and] pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official — even those otherwise not raising rising to the level of a constitutional violation — can be characterized [by the prisoner] has a constitutionally prescribed retaliatory act.

This statement is based on *Alverson v. Mills,* 2021 WL 1215804, at *8 (M.D. Ala. Jan. 20, 2021), report and recommendation adopted in part, 2021 WL 1216851 (M.D. Ala. Mar. 30, 2021).

This is an unreported Alabama case that is not authoritative as a matter of

law much less a sound basis for a finding of fact by the court. In fact, fabrications by prisoners are far from easy. The deck is clearly stacked against an inmate who claims retaliation since virtually all the mechanisms of proof in a prison environment are in the hands of prison officials who have the ability to investigate or not, to preserve evidence or not, and who write the reports that are the official record of the institution. The ease of fabrication is not on the prisoners side.

### D. Excessive Force

In *Bowden v. Stokely*, 576 Fed. Appx. 951 (11th Cir. 2014), an incident began with a verbal exchange regarding Bowden's compliance with shaving rules. Shortly after, Bowden was called to an officer's station – a location without security cameras – where a physical altercation occurred between Bowden and the two officers. The parties presented contradictory stories: the officers claimed Bowden attempted a battery, while Bowden alleged he was the victim of an unprovoked attack. It was undisputed that Bowden was taken to the ground, sprayed with chemical agents, and sustained a head laceration.

The Eleventh Circuit affirmed the district court's denial of summary judgement, establishing several key points: The "Malicious and Sadistic" Standard: The court reaffirmed that the core inquiry in Eighth Amendment excessive force cases is whether force was applied in a good faith effort to maintain discipline or "maliciously and sadistically to cause harm".

Force After Compliance: The court held that once a prisoner has stopped

resisting, there is no longer a need for force, and any force used thereafter is disproportionate. Bowden specifically alleged force continued after he was handcuffed and on his stomach.

Injury Threshold: The court emphasized that a "significant injury threshold" is not required to state an excessive force claim. An inmate who is "gratuitously beaten" does not lose their claim simply because they escaped serious injury.

Credibility of Evidence: The court ruled that credibility determinations are impermissible at the summary judgment stage. Court cannot resolve disputed evidence in favor of officers when the plaintiff's evidence is based on personal observations and not "blatantly contradicted" by other evidence in the record.

### E. Qualified Immunity Is Unavailable

There is no predicate pled for qualified immunity. Defendants have not answered the operative complaint and thus there is nothing pled as to whether the Defendants were engaged in a discretionary function.

In any case, courts in the Eleventh Circuit have held that in Eighth Amendment excessive force cases, the subjective element of "malicious and sadistic" intent is so extreme that such a violation is automatically "clearly established," making qualified immunity unavailable if the plaintiff's version of facts is believed. When a plaintiff's allegations establish an Eighth Amendment violation deemed cruel and unusual punishment, qualified immunity does not

attach. See *Skrtich v. Thornton*, 280 F.3d 1295, 1302 (11th Cir. 2002) ("Having determined that the [Appellees'] alleged beating violated [plaintiff's] Eighth Amendment rights, we conclude that no qualified immunity defense was available to the [Appellees]"); see also *Ash v. Landrum*, 819 Fed.Appx. 770, 774 (11th Cir. 2020) ("[A]s [plaintiff's] allegations establish an Eighth Amendment violation, we conclude that the district court erred in determining that the [Appellees] were entitled to qualified immunity"); *Bowden v. Stokley*, 576 Fed.Appx. 951, 955 (11th Cir. 2014) ("[B]ecause a reasonable jury could find [Appellees] violated [plaintiff's] Eighth Amendment rights, [Appellees] are not entitled to qualified immunity .... [W]here the plaintiff has sufficiently alleged or shown a material dispute of fact as to an excessive force claim, summary judgment based on qualified immunity is not appropriate"); *Fennell v. Gilstrap*, 559 F.3d 1212, 1217 (11th Cir. 2009) ("For claims of excessive force in violation of the Eighth . . . Amendment [] ... a plaintiff can overcome a defense of qualified immunity by showing only the first prong, that his Eighth . . . Amendment rights have been violated . . . . We created this rule because, for an excessive-force violation of the Eighth . . . Amendment[], the subjective element required to establish [the constitutional violation] is so extreme that every conceivable set of circumstances in which this constitutional violation occurs is clearly established to be a violation of the Constitution." *Herbert v. Miller*, CV 619-052, at *15-17 (S.D. Ga. Mar. 14, 2022).

WHEREFORE, Plaintiff moves the Court to deny the Defendants' Motion to Dismiss the Second Amended Complaint.

Respectfully Submitted,     /s/ James V. Cook
                            JAMES V. COOK, ESQ.
                            Florida Bar Number 0966843
                            Law Office of James Cook
                            314 West Jefferson Street
                            Tallahassee, FL 32301
                            (850) 222-8080; 561-0836 fax
                            cookjv@gmail.com

                            Attorney for Plaintiff

I CERTIFY the foregoing was filed electronically on 3/13/2026, serving counsel of record registered with the CM/ECF electronic filing system.

                                              s/James V. Cook

15