UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

REINALDO GLOVER,

Plaintiff,

v. Case No. 3:24-cv-1107-BJD-SJH

CAPTAIN CHRISTOPHER CAMACHO, et al.,

Defendants.

---

**ORDER**

THIS CAUSE is before the Court on Defendants' Motion to Dismiss the Second Amended Complaint (Motion to Dismiss, Doc. 45) and Plaintiff's Response (Doc. 49) thereto. For the following reasons, the Motion to Dismiss will be denied.

## I. PLAINTIFF'S ALLEGATIONS

Plaintiff Reinaldo Glover, a former inmate[1] of the Florida Department of Corrections (FDOC), is proceeding through counsel[2] on a Second Amended

---

[1] Plaintiff was released from prison on October 22, 2025, and is currently serving the probation portion of his sentence. *See* Corrections Offender Network, Fla. Dept. of Corrs., available at http://www.dc.state.fl.us/OffenderSearch/Search.aspx (last visited July 15, 2026).

[2] The Court appointed James V. Cook, Esq. to represent Plaintiff on October 22, 2025. *See* Doc. 28.

Complaint for Damages (SAC, Doc. 40), filed pursuant to 42 U.S.C. § 1983. Plaintiff sues the following Defendants in their individual capacities: (1) Captain Christopher Camacho (Camacho); (2) Captain Maria Banks (Banks); (3) Sergeant J. Guess (Guess); and (4) Sergeant Ralynne Fisher (Fisher). Doc. 40 at 1–2. Plaintiff raises claims of excessive use of force, failure to protect, failure to intervene, supervisory liability, retaliation, and conspiracy to violate civil rights based on events that occurred at Columbia Correctional Institution (Columbia C.I.) and Columbia C.I. Annex on July 4, 2024. *Id.* at 2, 9–13.

In the "Common Allegations of Facts" of the SAC, Plaintiff alleges as follows:

> 10. On July 4, 2024, Plaintiff was walking back from breakfast at Columbia C.I. Annex when he was tackled to the ground by an officer and taken to a holding cell in the confinement Dorm, Dorm N.
>
> 11. Fisher deployed chemical agents on Plaintiff as he sat in the holding cell because she claimed he was striking a light fixture, which Plaintiff denies.
>
> 12. At the time Fisher initiated the spray, Plaintiff was actually sitting on his bunk and was not engaged in any action to damage state property.
>
> 13. The use of force was not undertaken to stop him from damaging property.
>
> 14. Plaintiff admits he failed to submit to hand restraints in frustration with the fact that no one would take note of the physical evidence that showed he was not sprayed by Fisher while standing on a bench banging on a light fixture.

15. Banks was not present during the initial deployment of chemical agents but approved two more rounds of OC Spray for failing to cuff up.

16. At this point, Guess was present and gave the orders to cuff up or be sprayed with OC Spray again.

17. Subsequently, Plaintiff also received one round of CS Gas, a stronger and more dangerous chemical agent commonly avoided in closed spaces.

18. After being hit with chemical agents, Plaintiff was ordered to "cuff up" to be taken out of the cell. Plaintiff was afraid because he didn't know what was going on. Officers present referred to payback for an incident at Suwannee [C.I.] in January 2025[3] that was being investigated by the Office of Inspector General.

19. Plaintiff declared a psychological emergency. Plaintiff was an S-3 psych[ological] grade [inmate] and was entitled to crisis intervention (C.I.T.) but no supervisor called a mental health professional for C.I.T. but simply continued with consecutive uses of force.

20. About 10:43 a.m., Plaintiff again refused to submit to hand restraints. Guess called for another application of chemical agents, (three 1-second blasts).

21. About ten minutes later, Plaintiff again declines to cuff up and is sprayed with another round of chemical agents by Fisher, prompted by Guess.

22. Around 10:58 a.m., Camacho, who was then assigned to the Main Unit and not the Annex, comes to the cell front and tells Plaintiff that they are about to cell extract him and he, Camacho, will be on the cell extraction team.

---

[3] It appears the year should be 2024, not 2025.

23. A voice off camera states they were unable to reach a Duty Warden to get approval for the cell extraction but they are going ahead with it.

24. Plaintiff tells Camacho that he will lie face down on the floor with his hands behind his back but declines to put his hands through the food slot.

25. The holding cell door is opened and the team entered[.] They were Sgt. Jesse Williams, Sgt. Phillip Parrish, Sgt. Dylan Mudd, and Sgt. Kenneth Stengel.

26. On video, Plaintiff appears to be lying down on the floor face down. There is the sound of the handcuffs engaging and a cry of pain by Plaintiff.

27. Plaintiff again asks to speak to mental health and says that he feels like killing himself. Plaintiff is carried out in a four-man carry.

28. The team exits the cell with Plaintiff suspended by his ankles and elbows, straining his wrists, wrenching his shoulders, eliciting more cries of pain.

29. Plaintiff is moved to Cell 3102, where he attempts to hang himself. Officer Randy Dauzat ordered him to cease his efforts and sprays him with O.C. Spray. Plaintiff does not allege that this action was a constitutional violation.

30. At this point, the camera suddenly turns off. When the camera comes on again, the door to Cell 3102 is open and there is a partial view of several officers struggling with Plaintiff who cries out that someone is gouging his eye. A spit mask is placed on his head though he hadn't spat or tried to spit on anyone.

31. Again, Plaintiff is being roughly four-man carried although the officers have access to a rolling restraint chair. Officers are holding his arm under his elbow, wrenching his shoulder upwards. Wrist and leg restraints are too tight.

32. When leg restraints are tight around the ankle, they become unbearable when the prisoner tries to put weight on his feet and his tendons flex.

33. Plaintiff is carried to a hose outside one of the shower rooms. The hose is meant to clean the floors and the water is warm or hot. Decontamination showers must be cold because water that is warm or hot will open the pores and increase the sensation of the body being on fire caused by the chemicals.

34. An officer directs the hose to the top of Plaintiff's head which causes the gas to run into his eyes and across his face.

35. Giving a warm or hot water decontamination showers and flushing gas onto the eyes and face are common techniques to cause extreme pain.

36. As he sits on the floor outside the shower, one of the officers digs his finger into the base of Plaintiff's neck, squeezing his clavicle, another pain technique.

37. Plaintiff is placed in a restraint chair and Camacho lifts his cuffed hands up high behind his back while the others push his back forward. This is technique to cause pain by manipulating extremities and straining joints.

38. As the officers replace his hand restraints with restraint chair straps, Camacho twists Plaintiff's fingers and Plaintiff screams, "My fingers!"

39. Because the water coming down from his hair was laden with chemicals, Plaintiff pled with officers to direct water to his face without any response. Finally, Banks took the hose and sprayed water onto his face.

40. Guess and each of the officers on the cell-extraction team and the four-man carry used deliberate surreptitious pain techniques to inflict constant pain on Plaintiff or observed others doing so and failed to intervene, though able.

41. The abuse, including abuse that was blocked from the camera, took place within the field of vision of Camacho and Banks and they would have heard Plaintiff's cries of pain and descriptions of abuse as it happened.

42. As Plaintiff is placed in a van in the restraint chair for the trip to the Main Unit, Camacho tells the driver to "turn on the AC." This is a cue to turn on the heat, which, like hot water, opens the pores increasing pain. The warm air fogs the camera lens making the inside of the van hazy like the inside of a sauna.

43. When Plaintiff gets to the Main Unit, Camacho tells him in a low voice, "Welcome to Hell." Plaintiff does not see mental health and isn't allowed to eat until the next afternoon – a tiny serving of mixed vegetables and rice.

44. Camacho tells Plaintiff "You are going on the Jenny Craig diet, dammit, I'ma make sure you starve, you gonna wish you was dead. You gonna eat air."

45. Meal containers with no food in them are called "air trays" and are used to make it appear to the cameras like inmates who are denied food are being fed.

46. Camacho said, "You are at the gates of hell, nobody cares about you so don't even try to reach out for help because your mail is not going out and your grievances are not gonna get processed and you're gonna starve. You['ll] be lucky if you get to take a shower. Welcome to Camacho's World."

47. Although Camacho instructed medical staff, in Plaintiff's presence, not to let him access sick call, Plaintiff eventually was able to see medical for ongoing pain in his shoulders which were wrenched up during the four-man carry and restraint, during the shower and the placement in the restraint chair.

48. The medical note read, "Left shoulder with visible deformity around AC joint. TTP of entire area. Extremely limited ROM 2/2 pain . . . decreased sensation to triceps and lateral forearm."

> 49. When Plaintiff eventually gets an X-Ray, the report states, "Clavicular elevation suggests ligamentous injury. Consider MRI." An orthopedic specialist recommended that Plaintiff get physical therapy.
>
> 50. Plaintiff never got an MRI and the therapy was not approved.
>
> 51. Plaintiff continues to have pain and dysfunction in his left shoulder.

*Id.* at 2–7 (names abbreviated).

Under "Prior History of Abuse," Plaintiff alleges as follows:

> 58. Prior to the events of July 4, 2024, there was a history of animus on the part of Camacho toward Plaintiff. He made it clear to Plaintiff that he and his staff would take every opportunity to cause Plaintiff pain and distress.
>
> 59. Plaintiff had a history of filing grievances in FDOC and became the target of officers who were notorious for animus and brutality.
>
> 60. Plaintiff responded to the brutality and animus by writing more grievances against the most brutal guards, including Camacho, when he was threatened or physically abused and frequently suffered more abuse for his efforts.
>
> 61. Many officers who worked with Columbia C.I. were told that whenever they had trouble with Plaintiff, they should call him (Camacho) and he would take care of the problem whether it was in the Annex or Main Unit.
>
> 62. Prison staff, including medical staff, were instructed to make things as difficult as possible for Plaintiff, to surreptitiously use pain compliance techniques on Plaintiff while applying restraints or escorting Plaintiff[,] and to contaminate or deny his meals or have the orderlies do so.

> 63. The abuse at Columbia C.I. was part of a pattern of abuse by a group of security officers who routinely indulge in brutal acts against prisoners in retaliation for expressions of protected speech, including grievances on abuse.
>
> 64. These groups of officers have been referred to as a "negative subculture" by use of force auditors and as a "goon squad" by long-time Florida prison inmates.
>
> 65. When Plaintiff or other inmates deemed to be "writ writers" or "snitches" were transferred, Corrections officials would call ahead to friends at the new institution to carry on the retaliatory abusive treatment.

*Id.* at 8–9. As relief, Plaintiff seeks compensatory and punitive damages, attorney's fees, and costs. *Id.* at 14.

## II. LEGAL STANDARD

Under the Federal Rules of Civil Procedure, a defendant may move to dismiss a complaint for a plaintiff's "failure to state a claim upon which relief may be granted." Fed. R. Civ. P. 12(b)(6). In determining whether to dismiss under Rule 12(b)(6), a court accepts the factual allegations in the complaint as true and construes them in a light most favorable to the non-moving party. *See United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1269 (11th Cir. 2009). Nonetheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009). Though detailed factual allegations are not required, Rule 8(a) demands "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* A plaintiff should allege enough facts "to raise a reasonable expectation that discovery will reveal evidence" supporting the plaintiff's claims. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

Generally, a court should not consider extrinsic evidence when ruling on a motion to dismiss. *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."). However, a court may consider extrinsic evidence when ruling on a Rule 12(b)(6) motion if a document incorporated by reference in the complaint "is (1) central to the plaintiff's claim and (2) undisputed." *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) (citing *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002)); *see also Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) ("[W]here the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal."). "Evidence is 'undisputed' in this context if its authenticity is unchallenged." *Baker v. City of Madison, Ala.*, 67 F.4th 1268 (11th Cir. 2023) (citing *Horsley*, 304 F.3d at 1134).

## III. ANALYSIS

In the SAC, Plaintiff alleges claims for: (1) excessive use of force against Camacho and Fisher; (2) failure to protect against Camacho and Guess; (3) failure to intervene against Camacho, Banks, Guess, and Fisher; (4) retaliation against Camacho and Guess; (5) supervisory liability against Camacho and Banks; and (6) conspiracy to violate civil rights against Camacho, Banks, Guess, and Fisher, as well as unnamed medical personnel who ignored Plaintiff's sick-call requests as requested by Camacho. *See* Doc. 40 at 9–13.

In the Motion to Dismiss, Defendants argue that Plaintiff has failed to establish claims of excessive use of force and retaliation, and has failed to establish "any facts that overcome Defendants' entitlement to qualified immunity." Doc. 45 at 1. In support, Defendants submit five videos, which they believe "show the entire incident" and "clearly depict[] the events that are central to Plaintiff's claim." *Id.* at 4, 7–8. Defense counsel represents that the "videos are authentic and have not been redacted [or] altered in any manner." *Id.* at 5. Defendants ask the Court to incorporate the videos into the SAC based on the "incorporation by reference" doctrine, because they are central to Plaintiff's claims and are undisputed. *Id.* at 6–8.

Plaintiff responds that "some video can be said to be 'incorporated by reference' but not all" since there are "unexplained gaps in the video recording."

Doc. 49 at 7. While Plaintiff does not seem to dispute that the SAC references the video footage, *see* Doc. 40 at 3–4, 6, 12, and that the footage depicts at least some of the events that are central to his claims, Plaintiff seems to question the authenticity of the videos. *See* Doc. 49 at 5 ("The author of the Motion to Dismiss purports to certify that the videos are authentic and have not been redacted nor altered in any manner. There is no indication where this statement is coming from or whether the 'authentication' is authoritative.") (internal citations omitted).

The Court observes that the videos depict only some of the events alleged in the SAC. (*See* Docs. 25, 46). The first video (Exhibit A), which is 53:50 minutes, shows what happened after the first administration of chemical agents: Plaintiff's repeated protests that he was "gassed for no reason"; Plaintiff's reference to another incident involving him, which happened at Suwannee C.I. and was being investigated by the Inspector General's Office; Plaintiff's repeated declarations of a "psychological emergency"; Plaintiff's multiple refusals to submit to hand-restraints; the subsequent administration of chemical agents on Plaintiff at 10:43 a.m., 10:48 a.m., and 10:57 a.m.; the officers' preparation for the cell extraction; Plaintiff's statement that he would lay face down and would have his hands on his back when the officers enter

his cell; the cell extraction at around 11:13 a.m.; and the four-man carry of Plaintiff for a shower. *See id.*

The second video (Exhibit B), which is 17:23 minutes, shows some of the same events as Exhibit A, but from a different angle. *See id.* Exhibit B shows, *inter alia*, that the cell extraction team was lined up in front of Plaintiff's cell at around 11:14 a.m.[4]; by 11:15 a.m., Plaintiff was handcuffed and taken out of the cell; Plaintiff reported that he wanted to kill himself; Plaintiff was groaning in pain while he was carried out and his leg restraints were removed; Plaintiff was washed with a hose, during which he repeatedly cried for help; Plaintiff asked to be allowed to wash his body; Plaintiff continued to complain of pain in his arms, shoulders, and legs as he was carried away to medical; while at medical, Plaintiff continued to complain of having gas all over his body and face; while the officers were removing Plaintiff's restraints, he was yelling he could not breathe and was also complaining about his legs; the officers left Plaintiff's cell at around 11:31 a.m. *Id.*

The third video (Exhibit C), which is only 1 minute and 36 seconds, shows (without revealing the date or time) that the officers were outside of Plaintiff's

[4] The time announced on the video was 10:14 a.m., which appears to be an error.

cell number 3102, and were directing him to submit to hand restraints after his attempted self-harm incident. *Id.* The video ended abruptly. *Id.*

The fourth video (Exhibit D), which is 23:58 minutes, shows (without revealing the date or time) what happened after Plaintiff's cell door was already open and the officers were inside his cell, putting restraints on him.[5] *Id.* Plaintiff was crying out that someone was gouging his eye. *Id.* After he was restrained and a spit shield was placed on his face, Plaintiff, who appeared completely naked, was carried in a four-man carry to the showers. *Id.* Plaintiff was repeatedly crying out for help for his eye, shoulders, legs, and ankles. *Id.* He was complaining that an officer was sticking a finger in his neck. *Id.* He was also complaining that he could not breathe, which prompted the officers to remove his spit shield. *Id.* At or around 1:40 p.m., Plaintiff was yelling that the water from the hose was hot, he could not breathe, and he needed a cold shower. *Id.* Plaintiff was then dressed in a one-piece green "turtle suit" and escorted to medical in a restraint chair. *Id.* About nine minutes later, Plaintiff was escorted to a white van to be transported to the Main Unit. *Id.* The video ends with Plaintiff being loaded onto the van. *Id.*

[5] There is an apparent gap in the video footage because it is unclear when and how the officers entered Plaintiff's cell, and whether, as alleged in the SAC, Plaintiff was previously sprayed by chemical agents to stop his self-harm attempt. *See* Doc. 40 at 4.

The last video (Exhibit E), which is 14:22 minutes, shows Plaintiff was loaded onto the white van; he was riding in the restraint chair and was complaining he could not breathe; at times, it was foggy inside the van; upon arrival, Plaintiff was escorted to medical; and the video ended abruptly while Plaintiff was still at medical. *Id.*

In sum, the five handheld videos do not cover the entirety of Plaintiff's interactions with Defendants on July 4, 2024, which are alleged in the SAC.[6] For example, the videos do not show what happened: (1) before and during the first administration of chemical agents on Plaintiff[7]; (2) in the time gap between the third and the fourth video; and (3) after the fifth video when Plaintiff was still at medical. Also, without a date and time stamp on the videos, or at least a clear announcement of the date and time, the Court is left to speculate about the sequence and duration of the events, as well as the reasonableness of the officers' actions. Importantly, even when the videos capture the events alleged in the SAC, they do not always provide an unobstructed view of the parties or an audible recording of their conversations.

---

[6] If the Court is mistaken, Defendants may present declarations or other evidence to support their positions on a more complete record. On the current record, however, the Court cannot determine whether the videos support Defendants' view of the facts.

[7] Defendants concede that "the first initial complained incident occurs off camera." Doc. 45 at 12, 14.

Therefore, at this time, the Court cannot conclude that the videos obviously contradict Plaintiff's version of the facts. *See Logan v. Smith*, 439 F. App'x 798, 801 & n.3 (11th Cir. 2011)[8] (concluding on summary judgment that "the videos are insufficient to eliminate the possibility that the defendants applied sufficient force to violate the Eighth Amendment").[9] As such, accepting Plaintiff's factual allegations as true, the Court concludes that Plaintiff has sufficiently alleged claims of excessive use of force. To the extent Defendants seek the dismissal of these claims, the Motion to Dismiss will be denied.

Defendants' Motion to Dismiss will also be denied to the extent it raises the defense of qualified immunity. *See* Doc. 45 at 8–20. "In order to receive qualified immunity, the public official must first prove that he was acting

[8] Any unpublished decisions cited in this Order are deemed persuasive authority on the relevant point of law. *See McNamara v. GEICO*, 30 F.4th 1055, 1061 (11th Cir. 2022).

[9] While this case is not before the Court on a motion for summary judgment, in cases involving video evidence, the "Court will accept the video's depiction over [a party's] account of the facts if the video obviously contradicts [that party's] version of the facts." *Logan*, 439 F. App'x at 800 (citations omitted); *see also Morton v. Kirkwood*, 707 F.3d 1276, 1284 (11th Cir. 2013) (stating that "where an accurate video recording completely and clearly contradicts a party's testimony, that testimony becomes incredible"). "But where the recording does not clearly depict an event or action, and there is evidence going both ways on it, we take the [non-movant's] version of what happened." *Shaw v. City of Selma*, 884 F.3d 1093, 1097 n.1 (11th Cir. 2018). "But, even where the entire series of events is recorded, video evidence is not obviously contradictory if it fails to convey spoken words or tone, or fails to provide an unobstructed view of the events." *Logan*, 439 F. App'x at 800 (citing *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1316 n.2 (11th Cir. 2010) (declining to rely on video evidence to entirely discredit the plaintiff's version of events, because the video lacked sound and was periodically obstructed)).

within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quotation omitted). There is no dispute that Defendants were acting within their discretionary duties as correctional officers during the events underlying Plaintiff's claims. Thus, the burden shifts to Plaintiff to sufficiently allege that Defendants "(1) violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004). For excessive force claims, however, "a plaintiff can overcome a defense of qualified immunity by showing only . . . that his Eighth or Fourteenth Amendment rights have been violated."[10] *Fennell v. Gilstrap*, 559 F.3d 1212, 1216–17 (11th Cir. 2009) (citing *Johnson v. Breeden*, 280 F.3d 1308, 1321–22 (11th Cir. 2002)); *see also Skrtich*

---

[10] "Under the Eighth Amendment, force is deemed legitimate in a custodial setting if it is 'applied in a good-faith effort to maintain or restore discipline' and not 'maliciously and sadistically to cause harm.'" *Sears v. Roberts*, 922 F.3d 1199, 1205 (11th Cir. 2019) (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)). "This standard requires a prisoner to establish two elements – one subjective and one objective: the official must have both 'acted with a sufficiently culpable state of mind' (the subjective element), and the conduct must have been 'objectively harmful enough to establish a constitutional violation.'" *Sconiers v. Lockhart*, 946 F.3d 1256, 1265 (11th Cir. 2020) (quoting *Hudson*, 503 U.S. at 8). "In determining whether force was used 'maliciously and sadistically,' [courts] consider: (1) 'the need for the application of force'; (2) 'the relationship between the need and the amount of force that was used'; (3) 'the extent of the injury inflicted upon the prisoner'; (4) 'the extent of the threat to the safety of staff and inmates'; and (5) 'any efforts made to temper the severity of a forceful response.'" *Sears*, 922 F.3d at 1205 (*Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007)).

*v. Thornton*, 280 F.3d 1295, 1301 (11th Cir. 2002) (stating that the "defense of qualified immunity is not available" on an excessive force claim when a plaintiff alleges facts sufficient to survive a motion to dismiss or a motion for summary judgment because "the use of force 'maliciously and sadistically to cause harm' is clearly established to be a violation of the Constitution by the Supreme Court decisions in *Hudson* and *Whitley*[11]"), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009). Having determined that Plaintiff has sufficiently alleged claims of excessive use of force, no qualified immunity defense is available to Defendants. *See Skrtich*, 280 F.3d at 1301–02.

Nevertheless, the Court notes that at the time of the alleged events (July 2024), it was clearly established that "government officials may not use gratuitous force against a prisoner who has been already subdued."[12] *Skrtich*, 280 F.3d at 1303; *see also* W*illiams v. Burton*, 943 F.2d 1572, 1576 (11th Cir. 1991) ("The basic legal principle is that once the necessity for the application

[11] *Whitley v. Albers*, 475 U.S. 312 (1986).

[12] In *Skrtich*, the Eleventh Circuit Court of Appeals explained:

> The law of excessive force in this country is that a prisoner cannot be subjected to gratuitous or disproportionate force that has no object but to inflict pain. This is so whether the prisoner is in a cell, prison yard, police car, in handcuffs on the side of the road, or in any other custodial setting. The use of force must stop when the need for it to maintain or restore discipline no longer exists.

280 F.3d at 1304 (citing *Whitley*, 475 U.S. at 320–21).

of force ceases, any continued use of harmful force can be a violation of the Eighth and Fourteenth Amendments, and any abuse directed at the prisoner after he terminates his resistance to authority is an Eighth Amendment violation."). Further, "[e]ven when an initial use of force is constitutional," prison officials may violate the Constitution "by failing to temper the severity of their forceful response." *Pearson v. Taylor*, 665 F. App'x 858, 864 (11th Cir. 2016) (citing *Danley v. Allen*, 540 F.3d 1298, 1308–09 (11th Cir. 2008), *overruled in part on other grounds as recognized by Randall v. Scott*, 610 F.3d 701, 709 (11th Cir. 2010)). For example, "subjecting a prisoner to special confinement that causes him to suffer increased effects of environmental conditions—like pepper spray lingering in a small cell or on the inmate—can constitute excessive force." *Pearson*, 665 F. App'x at 864 (citing *Danley*, 540 F.3d at 1308–09); *see also Fennell*, 559 F.3d at 1220 (stating that "a prison guard fails to temper the severity of his use of force when he does not allow a prisoner whom he has pepper sprayed to adequately decontaminate himself") (citation omitted).

Accepting the allegations in the SAC as true, even with the benefit of the videos, Plaintiff has sufficiently alleged violations of his clearly established constitutional rights. *See Pourmoghani-Esfahani*, 625 F.3d at 1317 ("We stress that we do not decide today that Defendant, in reality, used unjustified or even

unnecessary force. On this record (even with the video), we cannot know. But . . . we have taken the 'facts' as Plaintiff asserts them. . . [and] accept that the force that Defendant used was obviously —in the light of the preexisting law— beyond what the Constitution would allow under the circumstances."). Thus, while Defendants may be entitled to qualified immunity after further factual development, at this stage of the proceeding, their request is denied.

In addition, Defendants argue that Plaintiff's retaliation claims should be dismissed for failure to plead sufficient facts in support. "The First Amendment forbids prison officials from retaliating against prisoners for exercising the right of free speech." *O'Bryant v. Finch*, 637 F.3d 1207, 1212 (11th Cir. 2011) (citation and quotation marks omitted). "'[A]n inmate is considered to be exercising his First Amendment right of freedom of speech when he complains to the prison's administrators about the conditions of his confinement.'" *Id.* (quoting *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008)). "An inmate may maintain a cause of action for retaliation under 42 U.S.C. § 1983 by showing that a prison official's actions were 'the result of [the inmate's] having filed a grievance concerning the conditions of his imprisonment.'" *Id.* (citation omitted). To state an actionable claim for retaliation, the inmate must allege:

> (1) his speech was constitutionally protected; (2) the inmate suffered adverse action such that the [official's] allegedly

> retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action and the protected speech.

*Id.* (quoting *Smith*, 532 F.3d at 1276).

In the SAC, Plaintiff alleges that on July 4, 2024: (1) without any justification, as Plaintiff was walking back from breakfast, "he was tackled to the ground by an officer and [was] taken to a holding cell"; (2) while sitting on the bunk in the holding cell, Plaintiff was sprayed with chemical agents by Fisher, who wrongly claimed that Plaintiff "was striking a light fixture"; (3) Fisher's "use of force was not undertaken to stop [Plaintiff] from damaging property"; (4) Plaintiff received "two more rounds of OC Spray" and "one round of CS Gas" for "failing to cuff up"; (5) "Plaintiff was afraid because he didn't know what was going on" as "[o]fficers present referred to payback for an incident at Suwannee [C.I.] in January 2025 [sic] that was being investigated by the Office of Inspector General"; (6) Plaintiff, an S-3 psychological grade inmate, declared a psychological emergency but the officers "simply continued with consecutive uses of force" without calling a mental health professional for crisis intervention; (7) after "another round of chemical agents by Fisher," Camacho, who was not assigned to the Annex, showed up and told Plaintiff that he would be on the cell extraction team; (8) the officers proceeded with the cell extraction even though they "were unable to reach a Duty Warden to get

approval" for it; (9) "the officers on the cell extraction team and four-man carry used deliberate surreptitious pain techniques to inflict constant pain on Plaintiff or observed others doing so and failed to intervene, though able"; (10) the officers also inflicted pain by denying Plaintiff a decontamination shower, by failing to wash his face and to use cold water, and by turning the heat on in the van; (11) Camacho told Plaintiff that he was "at the gates of hell," that he would wish he were dead, and that his mail would not go out and his grievances would not get processed; (12) Camacho instructed medical staff not to let Plaintiff access sick call; and (13) Plaintiff never received an MRI or physical therapy for his injury. Doc. 40 at 2–7.

In addition, Plaintiff alleges that prior to these events: (1) "there was a history of animus on the part of Camacho toward Plaintiff," where Camacho "made it clear to Plaintiff that he and his staff would take every opportunity to cause Plaintiff pain and distress"; (2) "Plaintiff had a history of filing grievances" and "became the target for officers who were notorious for animus and brutality"; (3) "Plaintiff responded to the brutality and animus by writing more grievances against the most brutal guards, including Camacho, when he was threatened or physically abused and frequently suffered more abuse for his efforts"; (4) many officers at Columbia C.I. were told that Camacho would take care of any problem involving Plaintiff regardless of whether it was in the

Annex or the Main Unit; (5) staff, including medical staff, "were instructed to make things as difficult as possible for Plaintiff, to surreptitiously use pain compliance techniques on Plaintiff while applying restraints or escorting Plaintiff[,] and to contaminate or deny his meals or have the orderlies do so"; (6) the "abuse at Columbia C.I. was part of a pattern of abuse by a group of security officers who routinely indulge in brutal acts against prisoners in retaliation for expressions of protected speech, including grievances on abuse"; and (7) when Plaintiff or other "writ writers" or "snitches" were transferred, correctional officers "would call ahead to friends at the new institution to carry on the retaliatory abusive treatment." *Id.* at 8–9.

Based on the allegations in the SAC, Plaintiff has sufficiently stated a retaliation claim.[13] Defendants argue that because Plaintiff has failed to establish claims for retaliation and excessive use of force, "there is equally no claim for conspiracy, failure to intervene, failure to protect, []or supervisor[y] liability." Doc. 45 at 22. Having found that Plaintiff has sufficiently stated claims for retaliation and excessive use of force, the Court rejects Defendants' argument that Plaintiff's claims for failure to protect and/or intervene, conspiracy, and supervisory liability should be dismissed.

---

[13] Defendants mistakenly believe that the events underlying this action occurred at Charlotte C.I. *See* Doc. 45 at 2, 21.

## IV. CONCLUSION

Accordingly, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendants' Motion to Dismiss (Doc. 45) is **DENIED**.

2. Defendants shall file an answer to the SAC within **twenty-one days** from the date of this Order.

3. A separate order setting case management deadlines will enter.

4. The Order to Show Cause (Doc. 26) is **DISCHARGED**. Defendants' Motion to Dismiss (Doc. 23) was previously denied as moot. *See* Doc. 39.

5. By **July 31, 2026**, the parties shall file a written notice advising the Court whether a settlement conference before a Magistrate Judge will be beneficial.

**DONE AND ORDERED** in Jacksonville, Florida, on July 20, 2024.

BRIAN J. DAVIS
United States District Judge

Jax-11 7/15

c: Counsel of Record